# EXHIBIT B

```
1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF WISCONSIN
2                      GREEN BAY DIVISION
   ----------------------------------------------------------
3
   STARCHA SPORRER,
4
            Plaintiff,
5
       -vs-                         Case No.:  1:22-cv-01110-WCG
6
   JOSEPH DULAK and KEEKO, LLC,
7
            Defendants.
8
   ----------------------------------------------------------
9

10
         DEPOSITION OF:    JOSEPH S. DULAK
11

12       DATE:             July 11, 2023

13
         TIME:             11:59 a.m. - 1:59 p.m.
14

15       LOCATION:         JOHNSON & WILSON LAW S.C.
                           1745 Stephenson Street
16                         Marinette, Wisconsin

17

18

19 REPORTED BY:
   CARRIE S. BOHRER, RPR, RMR, CRR
20 CARRIE BOHRER REPORTING, LLC
   www.cbreportingllc.com
21 920-606-3046

22

23

24

25
```

Page 2

```
 1            A P P E A R A N C E S
 2
   JOHNSON & WILSON LAW S.C., by
 3 NATHANIEL A. JOHNSON, Attorney at Law
   1745 Stephenson Street
 4 Marinette, Wisconsin  54143
   715-735-6671
 5 nathaniel@johnsonwilsonlaw.com
       appeared on behalf of the Plaintiff
 6
 7 DYKEMA GOSSETT PLLC, by
   JAMES F. HERMON, Attorney at Law
 8 400 Renaissance Center
   Detroit, Michigan  48243
 9 313-568-6540
   jhermon@dykema.com
10     appeared on behalf of the Defendants
11
   Also Present:  Starcha Sporrer, Plaintiff
12
13              * * * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2 EXAMINATION BY:                              PAGE
 3  Mr. Johnson ................................   5
 4
   EXHIBITS MARKED:                        PAGE ID'D
 5
   Exhibit 8   Defendants' Initial Disclosures
 6             Pursuant to Fed. R. Civ. P. 26 ...   4
 7 Exhibit 10  7/6/20 email to Starcha from Joe
              Dulak and Lease and Option to
 8            Purchase ........................  37
 9 Exhibit 11  Text message exchange between
              Ms. Sporrer and Mr. Dulak ........  59
10
   Exhibit 12  Letter addressed to Starcha
11             James ...........................  66
12    (Original exhibits were attached to original
       transcript; copies to transcript copies.)
13
14 REQUESTED INFORMATION:                       PAGE
15 NONE
16
17
18    (Original transcript filed with Attorney Johnson.)
19
20
21
22
23
24
25
```

Page 4

```
 1       TRANSCRIPT OF PROCEEDINGS
 2       (Exhibit 8, 10, and 11 marked for
 3 identification.)
 4       JOSEPH S. DULAK, called as a witness
 5 herein, having been first duly sworn/affirmed,
 6 was examined and testified as follows:
 7       MR. HERMON:  Before we go on the
 8 record with questions, we did have a discussion
 9 about the videotaping of the deposition, as the
10 deposition was noticed only stenographically and
11 not for video deposition, and that agreement is
12 that the video will be permitted and -- with the
13 understanding that it will not be used or filed
14 in any document with the court and that I get a
15 copy of it when the deposition is concluded.
16 Correct?
17       MR. JOHNSON:  Correct.  Agreed.
18 We'll provide it on a thumb drive to you --
19       MR. HERMON:  That's fine.
20       MR. JOHNSON:  -- to be used.
21    Okay.  This is a deposition of Joseph Dulak
22 in a lawsuit by Starcha Sporrer against Mr. Dulak
23 and Keeko, LLC.  It is currently pending in the
24 U.S. District Court for the Eastern District of
25 Wisconsin, Green Bay Division.  It's being
```

Page 5

```
 1     conducted at the law offices of Johnson & Wilson
 2     in Marinette, Wisconsin, on July 11th, 2023.
 3        Present in the room are the deponent,
 4     Mr. Dulak; the plaintiff, Ms. Sporrer; along
 5     with counsel for both of them; and the court
 6     reporter.
 7                  EXAMINATION
 8 BY MR. JOHNSON:
 9 Q  Good morning, Mr. Dulak.
10 A  Good morning.
11 Q  How are you?
12 A  Very good.
13 Q  So now we're afternoon.  We got one minute.
14       MR. HERMON:  8 seconds, but yeah.
15 Q  As you know, I'm the attorney representing
16    Ms. Sporrer in a lawsuit that makes several
17    allegations of sexual harassment amongst other
18    issues related to a lease, an option to purchase.
19    You've been participating in this lawsuit since
20    the beginning.  And today we're going to be
21    asking you questions related to it.  Now, I'm
22    going to go over the rules, and I know you were
23    present for Anita's deposition prior to this,
24    and the rules will be the same.  But as a
25    formality I want to remind you to make sure that
```

**Page 10**

1 State Wide over something related to a septic
2 system?
3 A Correct.
4 Q And are you aware of any other lawsuits in the
5 last ten years with State Wide involvement?
6 Excluding this one, of course.
7 A No. Not that I can recall, no.
8 Q Are you aware of any administrative proceeding
9 or complaint that any person involved with State
10 Wide, and what I mean by that is any independent
11 contractor, employee, or owner of State Wide,
12 was involved in? So that would include
13 complaints that were filed with any state
14 commission, such as a real estate licensing
15 board, either in Wisconsin or Michigan, or any
16 other agency. And I'll -- within the last ten
17 years.
18 A Oh, boy. I -- nothing against me personally.
19 Perhaps with an agent or something within the
20 office.
21 Q Do you recall any complaints that were filed
22 against your agents?
23 A I recalled a complaint filed by Starcha against
24 an agent in an outside company.
25 Q Okay. So it was filed against someone else?

**Page 11**

1 A Correct.
2 Q Any that were filed against agents that worked
3 for State Wide?
4 A I don't recall. I would say no. I don't recall.
5 To the best of my recollection I can't think of
6 any.
7 Q Thank you. How did you first meet Starcha
8 Sporrer?
9 A I -- could you please rephrase that question for
10 me?
11 Q When was the first -- do you know Starcha
12 Sporrer?
13 A Yes.
14 Q How did you meet her?
15 A Many years ago. I'm not sure when, but many
16 years ago.
17 Q Was it through a professional contact, a personal
18 contact, out in the community? Do you recall at
19 all?
20 A Likely through some real estate capacity.
21 Q Okay. And at what point did she become involved
22 with State Wide Real Estate?
23 A I believe it was October 18th of 2018. Not sure
24 of the year.
25 Q But you're sure of the date October 18th. Why

**Page 12**

1 does that date in specific stand out to you?
2 A Something stands out where -- it was a date that
3 stands out because something -- some paperwork
4 was filed with the State.
5 Q Do you know what paperwork that was?
6 A I don't recall. I believe in October
7 something -- somewhere I seen something
8 October 18th. I don't remember what it is. But
9 October -- not -- excuse me. June -- 8/18. Not
10 October 8. The month of August. Somewhere in
11 there.
12 Q I'm a little confused. October, the month of
13 August?
14 A 8. The month of 8. January, February, March --
15 Q Oh. Got the month wrong.
16 A Yeah.
17 Q Okay. Thank you. Thank you for the clarity.
18 8/18 of '18?
19 A I believe so.
20 Q Lot of 8s.
21 A Yeah.
22 Q So when -- when Starcha started her relationship
23 with State Wide Real Estate, can you tell me
24 about what happened? Did she approach State
25 Wide? Did you or someone from State Wide

**Page 13**

1 approach her? How did that all start?
2 A Previous to her requesting being licensed with
3 State Wide as an independent contractor, on a
4 few occasions in previous months the subject in
5 conversation came up about her dissatisfaction
6 where she was employed, an independent contractor
7 of. And I informed her of the State Wide
8 organization and our family of what we have to
9 offer our team players as an independent
10 contractor.
11 Q When you did that, did you use the term
12 "independent contractor" as you discussed it
13 with her?
14 A Every real estate agent that holds a license
15 knows they are an independent contractor. It's
16 just the way the industry works.
17 Q So I'll represent to you that I have a real
18 estate license and a broker's license, and
19 though I agree with you that the industry works
20 that way, that's not always the standard. There
21 are some real estate agents who are employees.
22 Have you ever had a real estate agent who was an
23 employee?
24 A No.
25 Q Are you aware of any firms that do?

Page 14

1  A   I'm not sure what other firms do.
2  Q   Okay.  You said that she was working somewhere
3      that -- she being Starcha was working somewhere
4      else when you discussed the benefits that State
5      Wide may have for her.  Do you know where she
6      was working at that time?
7  A   Place Perfect Real Estate.
8  Q   And when you had that discussion after you
9      described what State Wide could do, at what point
10     did she start working for State Wide?
11 A   I would have to guess.  I'm not sure.
12 Q   Can you give me a ballpark?
13 A   Ballpark?
14 Q   Um-hmm.
15 A   Ballpark -- your question again?
16 Q   When she started working with State Wide.
17 A   Two -- three months maybe.  Guessing.
18 Q   After that conversation?  Is that what you're
19     saying two, three months?  I'm not sure what the
20     two, three months means.  I just want a little
21     bit of clarification.
22 A   I'm -- I'm guessing.  I really don't recall.
23 Q   Somewhere near that conversation?  Is that what
24     you're saying when you say two, three months?
25 A   Well, there perhaps were more than one

Page 15

1      conversation.
2  Q   Okay.  So you had conversations with her, and at
3      some point she started working for State Wide,
4      correct?
5  A   Correct.
6  Q   Okay.  And you're not sure exactly when that was?
7  A   What, the dates of the conversations?
8  Q   No, when she started working for State Wide.
9  A   August of '18.
10 Q   Is when she started working for State Wide?
11 A   I believe, yeah.  I mean, the dates get confusing
12     after four, five years, obviously.
13 Q   Were you the one that hired her?
14 A   I'm not sure of the word "hired her," but am I
15     the one that allowed her to join the State Wide
16     team?  Yes.
17 Q   Okay.  Why?  Why did you allow her to join the
18     State Wide team?
19 A   I thought she had a lot of potential, I have a
20     lot of experience as a broker, I thought I could
21     supervise her, mentor her, be a good broker for
22     her, allow her to be a member of a good State
23     Wide team, offer her things the other broker
24     couldn't, and had many benefits that the other
25     brokerage firm did not offer.

Page 16

1  Q   And what are those benefits and things that you
2      could offer that the other firm could not?
3  A   I could offer her many more leads because I know
4      a lot of people, and I filter the leads to the
5      team members in my organization.  I also offer
6      my family team, I treat them like family, and
7      consider loans to give them to help them out in
8      difficult times.  Could you repeat your question
9      again?
10 Q   What the benefits are that you could offer that
11     other firms could not.  And so far you've listed
12     filtering leads and loans when people are in
13     difficult times.
14 A   Provide her a quality service of a truly
15     concerned professional broker that has been in
16     business for 40 years, give her an opportunity
17     to learn and grow, and treat her fairly and
18     equitably.
19 Q   What was your first impression of Ms. Sporrer
20     when you first met her?
21 A   Green.
22 Q   So by green do you mean --
23 A   But had a lot of potential.
24 Q   So by green do you mean inexperienced?
25 A   She had some rough edges.  And green but

Page 17

1      potential.
2  Q   When she began working with State Wide, did you
3      have her sign an independent contractor
4      agreement?
5  A   I don't believe initially.
6  Q   Why not?
7  A   If I recall, out of the blue one day she calls
8      and said, I'm ready to make the move; I want to
9      do it now.  (Nonword sound.)  Whether it was
10     late in the day or a weekend, I don't recall.  I
11     believe my secretary was out of town, and there
12     are forms that are required to be filled out and
13     signed by both the broker and the agent relative
14     to license transfer.  It was calling my secretary
15     to get everything ready and put it together and
16     just did not get to that part of it.
17 Q   Who's your secretary?
18 A   Anita Anderson.
19 Q   And was she an employee?
20 A   No.
21 Q   Are you familiar with the laws regarding who can
22     and cannot be an independent contractor?
23 A   I'm not an expert in that.
24 Q   I just asked if you were familiar with the laws.
25     I didn't ask if you were an expert.  Have you

Page 22

1  A   Yeah.
2  Q   Are you the boss?
3  A   Yes.
4  Q   Okay. In your capacity as the boss of State
5      Wide, are you aware of any complaints filed by
6      any of your independent contractors -- now, when
7      I say filed, it doesn't have to be in writing,
8      just brought up, a complaint about harassment in
9      the family, as you've termed it, at State Wide.
10 A   No.
11 Q   So no one's ever complained that they felt
12     uncomfortable at any given circumstance at State
13     Wide?
14 A   No.
15 Q   What would you describe the culture at State
16     Wide like? The corporate culture if I can use a
17     term that's more commonly used.
18 A   Open, friendly, family, work together
19     professionally, have fun, --
20 Q   Does that --
21 A   -- enjoy your job.
22 Q   Let's talk a little bit about what I'm going to
23     hand you, which is Exhibit 2. Are you aware of
24     what that document is?
25 A   Yes.

Page 23

1  Q   And what is that document?
2  A   It says Lease and Option to Purchase Agreement.
3  Q   And how are you aware of that document?
4  A   This document was in files at my State Wide
5      office, the format of this document.
6  Q   When you say the format of that document, are
7      you referring to some type of a form document?
8  A   Correct.
9  Q   Do you know why that document that's before you
10     was produced? Why that document before you was
11     produced?
12 A   I guess I don't understand the question.
13 Q   All right. So we know that this lawsuit's about
14     the lease and option that's between Keeko, LLC,
15     that's part of the lawsuit, and Ms. Sporrer.
16     Correct? You're aware of that? Is that true?
17 A   Yes.
18 Q   Okay. So what I want to find out is your
19     involvement in that whole deal. The purchase of
20     the property, the execution of the lease and
21     option, and the management of Keeko. So my
22     questions are all related to understand what your
23     role in this whole process was. Fair enough?
24 A   Yes.
25 Q   So given that understanding, what I'd like to

Page 24

1      know is did you instruct anyone to create that
2      lease?
3  A   This lease is a form agreement to which there is
4      fill-in-the-blanks.
5  Q   And where did that form come from originally?
6  A   It's been around for many years. I did not
7      create this form. This form I believe was
8      created from my understanding by a local
9      attorney and used by somebody else, and I
10     received a copy of it and just started using a
11     pre-made form.
12 Q   The original copy that you received, were there
13     blanks in the copy to fill in?
14 A   Yes.
15 Q   Do you know who you believe the attorney to have
16     been that created that document?
17 A   Not sure which attorney.
18 Q   So let's back up a little bit and talk about the
19     house. So the house that is leased under that
20     agreement, which -- are you aware of the address
21     of that property?
22 A   Yes.
23 Q   And what is that address?
24 A   N2360 Rivers Edge Drive.
25 Q   Okay. Do you know how Keeko came about to own

Page 25

1      that property?
2  A   Yes.
3  Q   Can you tell me about that?
4  A   Starcha called me one day. She was all excited.
5      She said she showed a property to some people,
6      and she thought the house is just fantastic, it
7      would be great for her and her family, and in
8      the worst way she thought it would be an ideal
9      house for her and her family, and she said this
10     house will not last on the market, she said she's
11     in no position to buy it at that point in time,
12     she asked if somehow I could get involved to
13     facilitate this.
14 Q   The purchase of the property?
15 A   Correct. And she said this house won't last,
16     and she needed answers extremely quick. I of
17     course was concerned about her fiduciary.
18 Q   Can you describe what you mean by being concerned
19     about her fiduciary?
20 A   Yes. Okay. Her fiduciary responsibility to the
21     person she showed the house to. If she was a
22     buyer's agent, she had to watch herself to expose
23     herself from the liability to interject herself
24     into the equation. I did not want to see a
25     situation that would expose a fiduciary breach,

Page 26

1 because she already was reprimanded by the State
2 one time for that, and I didn't want that to
3 happen again.
4 Q So as you're a supervising broker, what did you
5   do to protect your independent contractor?
6 A I told her, Are you a buyer's agent? Because
7   you would be in trouble with your fiduciary if
8   this was pursued. She said she was a seller's
9   agent. I said, Good.
10 Q So let's go back to the purchase of the house.
11   She called you, she really wanted the house,
12   asked you what you could do to help, and it was
13   a quick timeline. So let's continue down that
14   story. What happened next?
15 A I told her I might consider it and don't act
16   extremely spontaneously because spontaneous
17   decisions get you in trouble.
18 Q So what were you considering? Buying the house
19   for her? Financing it for her?
20 A Acting in some capacity to secure the property,
21   and she could explain what she wanted to do to
22   make the transaction happen.
23 Q And did she do that? Did she explain what she
24   could do to make the transaction happen?
25 A She explained. She said, I have this house I

Page 27

1    can sell, and I can pay this and do that, but in
2    the meantime I need to secure this house quickly
3    with a cash offer, and -- and she went over what
4    she had to expend on the house and what she
5    thought it was worth. I mean, she -- she was
6    very persistent. And I prefer to talk on the
7    phone, because there's more dialogue in a phone
8    conversation than there is with texting. So she
9    would text and she'd -- something about how much
10   she was going to spend on it and what it would
11   be worth, the $12,000 she spends on it, it's
12   worth -- and I said, You're optimistic on these
13   numbers that you're thinking, and are you sure
14   you really want this? And she said, Here's --
15   here's what I can do, I can pay you off within a
16   year, six months, a year absolutely max, and I
17   can pay you a thousand dollars a month, and
18   blah, blah, blah, blah, blah; can you somehow
19   get involved to make this happen for me, but you
20   have to act quick?
21       I repeated, I do not like making quick
22   movements and for her to seriously consider this.
23   She was persistently texting me and -- and I just
24   moved it forward.
25 Q What do you mean by moved it forward?

Page 28

1 A Wrote -- an offer was written on the property, I
2   believe it was listed for 169,900, I think,
3   something like that. Offered I believe it was
4   140.
5 Q And was that offer written in your name?
6 A Keeko.
7 Q Okay. Are you a member of Keeko?
8 A No.
9 Q So Starcha asked you if you could purchase this
10   home for her in some manner; you wrote an offer
11   for an LLC, that was not your LLC, to purchase
12   the home?
13 A Correct.
14 Q Did Starcha know that you were doing that through
15   an LLC that was not your LLC?
16 A Yes.
17 Q Did you tell her?
18 A Yes.
19 Q And who are the members of Keeko, LLC?
20 A Joseph -- Joseph Dulak. Joseph M.
21 Q Is he the sole member?
22 A I believe so. I'm not sure.
23 Q How did you obtain the authority to bind the
24   LLC?
25 A I'm -- I'm authorized on behalf of Keeko.

Page 29

1 Q Do you have a written agreement with Keeko?
2 A Yes.
3 Q And what does that written agreement say?
4 A I don't know.
5 Q In terms. Broad terms. What does it -- what
6   does it grant you?
7       MR. HERMON: Objection. Best
8   evidence rule. Go ahead and answer if you know.
9 A I really don't know.
10 Q But there is some document out there?
11 A Oh, yes.
12 Q Okay. And are you the registered agent for
13   Keeko, LLC?
14 A I -- I don't know. I may be. I don't know.
15 Q Do you believe that a registered agent should
16   know if they're a registered agent?
17 A There's many different legal terms to whatever
18   this is, and I'm not an attorney. I know that
19   attorneys prepared these entities for me and the
20   appropriate documents necessary. Exactly what
21   they all say I don't know.
22 Q Did an attorney prepare the documents for Keeko,
23   LLC?
24 A Absolutely.
25 Q And who was that attorney?

Page 30

1 A I would have to look back. Not sure.
2 Q You're not sure. Was it a Wisconsin or a
3 Michigan attorney?
4 A I'm not sure.
5 Q Do you know who contacted the attorney to set up
6 Keeko?
7 A Both Joe and I discussed it, and we agreed that
8 an attorney should prepare appropriate
9 documentation.
10 Q Do you remember when that was?
11 A I don't remember.
12 Q Do you know what year Keeko was formed?
13 A I really don't. I really don't.
14 Q Is it very old?
15 A What do you mean by old?
16 Q Is it ten years old?
17 A Good guess.
18 Q Or more?
19 A Somewhere in that area.
20 Q Somewhere --
21 A Somewhere in that area.
22 Q What was the purpose of Keeko? Why did you form
23 it?
24 A Real estate investment company.
25 Q So that real estate investment company existed

Page 31

1 prior to Starcha approaching you about the
2 purchase of the Rivers Drive property?
3 A Many, many, many years.
4 Q And did Keeko at that time own other properties?
5 A I'm not sure. I would think -- I think so.
6 Q Okay. In the past had Keeko ever used that form
7 lease for any of the other properties it owned?
8 A I'm not sure if Keeko used it, but other entities
9 used this form.
10 Q Entities that are owned by you?
11 A Perhaps.
12 Q Well, either they were or they were not.
13 A I'm not sure.
14 Q Did any entities owned or controlled by you use
15 that form?
16 A Yes.
17 Q Do you know which ones?
18 A Not by recollection.
19 Q But you do know that it was used?
20 A Yes.
21 Q Let's fast-forward back to the very document in
22 front of you, Exhibit 2, as it's completed. Did
23 you instruct Anita Anderson to fill in the blanks
24 on the form as -- as you've stated it was, with
25 terms related to the purchase and lease of the

Page 32

1 Rivers Edge property?
2 A Repeat that, please.
3 Q Did you instruct Anita Anderson to fill in the
4 blank on the form that resulted in becoming
5 Exhibit 2 in front of you, with the terms for
6 this deal, with Starcha, with Keeko, with the
7 rental payments, did you instruct her to do
8 that?
9 A I instructed her to give me a copy of this
10 agreement.
11 Q As completed?
12 A No.
13 Q Blank?
14 A Well, just with all of it except the name of the
15 person and the address of the property and --
16 you know, they just -- just -- so this form was
17 given to me and it -- parts were blank, and I
18 put the address, the -- the amount, and the down
19 payment, and what the monthly payments are, and
20 then I filled in the blanks and then gave it to
21 Anita.
22 Q And then what did -- are you aware of what Anita
23 did with it after you gave it to her?
24 A Well, obviously typed -- just filled in the
25 blanks.

Page 33

1 Q So you handwrote on it, gave it to her, and she
2 took those handwritings and turned it into type
3 on I assume a computer or a typewriter; is that
4 accurate?
5 A Yes.
6 Q Prior to you doing that -- well, let me ask you
7 this. Let me strike that.
8   When you completed that form, had you
9 purchased the property already? Had Keeko
10 purchased the property already?
11 A No.
12 Q So you prepared a lease for a property that was
13 not purchased; is that correct?
14 A It had an accepted offer.
15 Q So it was an accepted offer. Do you know what
16 date that offer closed?
17 A The offer closed?
18 Q Um-hmm. What date was the property purchased,
19 the transaction closed?
20 A I believe what had happened, in sequence, is once
21 the offer was accepted, I texted Starcha and I
22 told her to call me.
23 Q And do you know that date?
24 A 5/14, I believe. I believe it was May 14th.
25 Q Is when you believe the offer was accepted?

Page 34

1 A Correct. And I called Starcha -- I texted her.
2 I said, Call me.
3 Q Okay. And at that point, is that when you
4 started preparing the lease and option agreement,
5 or was that already prepared?
6 A No. I talked to her and I said, Starcha, we need
7 to be crystal clear on how this is moving forward.
8 I want you to know that there is an accepted
9 offer on the property. I also want you to be
10 crystal clear as to how this will be structured.
11 I said, What I am proposing is a lease and an
12 option to purchase. That lease and option to
13 purchase gives you one year to consummate the
14 transaction. You will pay one thousand dollars
15 a month, as rent. You are a tenant. This is
16 not a land contract. This is a lease option.
17 Any improvements that you make during the term
18 of the lease, it will be all spelled out in the
19 lease option, are improvements you're allowed to.
20 You can also pay any amount you want previous at
21 any time. You have to make your payments, you
22 have to consummate this transaction for the
23 option period, and if you don't honor your
24 commitment on it, you are chopped liver.
25 Q Did you use that term when you called her?

Page 35

1 A Chopped liver. Yes, sir, I did. If you don't
2 honor the terms and conditions of this contract,
3 you're chopped liver. You will lose all your
4 improvements, you'll lose any money you put down,
5 and it's -- it's party over. Stick a fork in it.
6 Q And did you produce this document then after
7 that conversation?
8 A I told her that that's the -- that's what I
9 propose moving forward. I said, Anita will have
10 this for you; it will be over at the Menominee
11 office. Come on over, look at it, understand
12 it, be happy with it. If you are, you sign it.
13 If you're not happy with it, I am not excited
14 about buying this house and doing this
15 transaction as I have nothing to gain from this
16 whatsoever. The price is set, what I'm paying
17 for it. This is a benefit to you. You need to
18 be comfortable with this. And if you are, sign
19 it; we'll move the transaction forward. If not,
20 there is an out policy on the offer, and we'll
21 just scrap the deal if it doesn't work, you're
22 not happy with it, and just end it.
23 Q Was there any discussion of a land contract
24 prior to that phone call?
25 A She had said something about a land contract

Page 36

1 previously, but I never, ever agreed to a land
2 contract.
3 Q So the first time you mentioned the terms of
4 this lease and option agreement were sometime
5 after May 14th when you had an accepted offer on
6 the property; is that accurate?
7 A May have said something previous to that, but I
8 wanted her to -- to see the entire agreement in
9 its entirety, be comfortable with it moving
10 forward.
11 Q So your testimony is that on or about 5/14,
12 shortly thereafter, you called Starcha to outline
13 this deal. Did you fill out this lease and
14 option agreement that same day or was it a
15 different day?
16 A I'm not sure.
17 Q Do you know if it was relatively quick?
18 A Oh, relatively quick. Just --
19 Q So within a week?
20 A Yes.
21 Q When did you -- did -- let me ask you. Did you
22 send it to Starcha, the agreement, that lease
23 option agreement?
24 A No. I said, It's at the office, stop on by.
25 She's in and out of the office. Stop on by,

Page 37

1 look at it.
2 Q And that was all verbally?
3 A Correct.
4 Q At any point did you email it to her?
5 A No. She was stopping by the office.
6 Q So you did not email it to her?
7 A I don't recall. I don't recall. She's --
8 because she's stopping by the office.
9 Q I'm going to hand you what's been marked
10 Exhibit 10. I'll give you a moment to look at
11 that.
12 A (Reviewing document.) Yeah.
13 Q Can you tell me what this is when you're ready?
14 A Lease and option.
15     MR. HERMON: I'm going to enter an
16 objection to 10 on authenticity grounds, but go
17 ahead. There's no indication that this was an
18 attachment to the email.
19     MR. JOHNSON: I'm asking him if he
20 can identify it, so I'm going through that
21 authentication.
22     MR. HERMON: Okay. Let's see if it
23 can be authenticated.
24 A It's a Lease and Option to Purchase.
25 Q Do you see the first page where it -- I'll direct

Page 46

1  A   Yes.
2  Q   And what were the terms of those deals and who
3      were the agents?  Let's just deal with last
4      year.
5  A   Last year.
6  Q   We'll do last year.
7  A   Okay.
8  Q   So '22.
9  A   John Christopherson, 16,000.
10 Q   And did he pay that back?
11 A   Yes.
12 Q   Who else?
13 A   Brandie Gromala, $30 -- 30-some thousand.
14 Q   And did she pay that back?
15 A   Yes.
16 Q   Okay.
17 A   Also another one to friends and family -- yeah,
18     I would -- 63,000 paid back.
19 Q   To who?  I didn't catch the name.
20 A   Brandie Gromala, I believe.
21 Q   63,000?
22 A   I believe so.  I'm not sure of the dollar amount.
23 Q   So would it be safe to say that it was a similar
24     pattern in prior years?  Maybe not the same
25     agents but agents would come to you and borrow

Page 47

1      money and typically --
2  A   Yes.
3  Q   -- you'd be paid out of commissions --
4  A   Yes.
5  Q   -- or something similar?
6  A   (Nods head up and down.)
7  Q   Okay.  So you were in here for Anita Anderson's
8      deposition, and in her deposition she testified
9      and she was asked questions about amounts that
10     were withheld or at least allegedly withheld out
11     of Starcha's paycheck.  Are you familiar with
12     the commission checks that your agents receive?
13     Is that something that you would review as part
14     of your job?
15 A   Yes.
16 Q   Are you familiar with Starcha's checks?
17 A   Not all of them.
18 Q   I'll hand you Exhibit 3.  Right there.  And on
19     Exhibit 3, as you heard Anita testify that she
20     produced this document.  And it is the rental
21     payments that were applied under the lease and
22     option agreement.  Do you recall that testimony?
23 A   Yes.
24 Q   Okay.  Are you familiar with these checks and
25     payments on here?

Page 48

1  A   Not all of them.
2  Q   Are you familiar with the entry from March 12th,
3      '21, the $2,000 entry?
4  A   No.
5  Q   So that entry says that it's a -- paid $2,000 on
6      down price -- down purchase price.  Were you
7      aware in March that she had paid $2,000 on the
8      purchase price of the home?
9  A   I don't recall.
10 Q   But someone at your office was?  Anita knew,
11     correct?
12 A   Pardon me?
13 Q   Anita knew about the $2,000 payment, correct?
14 A   Well, it's on the sheet.
15 Q   Did you instruct her to take 2,000 out of a
16     commission check?
17 A   I don't recall.  I don't believe so.
18 Q   Okay.  Was that $2,000 to the best of your
19     recollection deposited into Keeko's bank account?
20 A   I'm sure it was.
21 Q   And the check date and deposit date according to
22     this is March 12th, '21; is that correct?
23 A   That's what it says, yes.
24 Q   Okay.  Are you aware of what other amounts, if
25     any, were taken out of Starcha's commission

Page 49

1      checks besides the franchise fee of -- I believe
2      you said it was 7 percent?  Is that accurate?
3  A   Correct.  Well, in -- correct.  Initially in 2018
4      when she -- when she started, it was 7 percent.
5  Q   What is it now?
6  A   5 -- it was reduced to 5 percent.
7  Q   Okay.  Did you always take that percentage out
8      of her commission checks?
9  A   Well, it just come -- I think -- it doesn't come
10     out of her checks.  It just comes off of the
11     gross amount that's paid to State Wide.
12 Q   Okay.  So is that taken out at closing on the
13     closing statement?
14 A   No.  It -- the gross amount comes in as a check
15     payable to State Wide.
16 Q   Um-hmm.
17 A   And then, as I explained, a sheet is composed,
18     gross amount, less any referral fees or what's
19     paid out, if they have to refer to another
20     company or whatever, and then the corporate
21     franchise fee is 7 percent or 5 percent, and
22     then down for a net figure.
23 Q   Did you give that money back to Starcha at the
24     end of the year?
25 A   No.

Page 50

| | | |
|---|---|---|
| 1 | Q | Did you give her a bonus at the end of the year? |
| 2 | A | There were years I gave her a bonus, yes. |
| 3 | Q | Did that bonus -- or was that bonus the same |
| 4 | | amount as what was taken out for a franchise fee? |
| 5 | A | No. |
| 6 | Q | How did you come to the number of the bonus? |
| 7 | A | In our discussions previous to her becoming an |
| 8 | | independent contractor, within our agreement, she |
| 9 | | wanted more than the 75 percent of the net.  I |
| 10 | | explained to her it's difficult to have a company |
| 11 | | to be paying out those dollar amounts and be |
| 12 | | operationally profitable.  I said provided -- I |
| 13 | | said I will -- if the following occurred, I will |
| 14 | | give you a bonus:  If the company has a good |
| 15 | | year; my company is operationally profitable; if |
| 16 | | you -- good, loyal, team-playing individual, |
| 17 | | family member of the State Wide organization; I |
| 18 | | don't have to spend extensive time mentoring you |
| 19 | | or babysitting your transactions; if I don't get |
| 20 | | sued for any action on your behalf; if it's a |
| 21 | | great year and everything is good and everything |
| 22 | | goes well, I may be able to pay you a bonus equal |
| 23 | | to 5 percent of your net sales. |
| 24 | Q | And that was all a discussion prior to her |
| 25 | | becoming an independent contractor? |

Page 51

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | So prior to 2018? |
| 3 | A | Correct. |
| 4 | Q | During Anita's deposition we had some text |
| 5 | | messages which Anita stated in her conversation |
| 6 | | with Starcha that she had to get authorization |
| 7 | | from you to cut the checks and that -- you heard |
| 8 | | her testimony is that you didn't want any -- you |
| 9 | | wanted her to stop doing what she was doing and |
| 10 | | get the independent contractors.  And she |
| 11 | | happened to be writing commission checks at the |
| 12 | | time.  Is that accurate testimony? |
| 13 | A | As I recall, from a procedural thing, all agents |
| 14 | | received their independent contractor agreements. |
| 15 | | Some of them came back immediately.  Some of them |
| 16 | | you had to remind people.  Periodically I would |
| 17 | | ask Anita, How's everything coming in?  Yeah, |
| 18 | | well, this one -- they all came back -- John, is |
| 19 | | what he says.  Who else?  Starcha.  Well, typical |
| 20 | | to wait for Starcha, but okay. |
| 21 | |     I don't know if it was a weekend or I was |
| 22 | | going out of town, and she had written checks, |
| 23 | | and I said, Is everything taken care of?  I |
| 24 | | said, Darn it, see -- get that from Starcha; |
| 25 | | what's the problem?  And I never heard anything |

Page 52

| | | |
|---|---|---|
| 1 | | from Starcha.  I said if she has a problem -- |
| 2 | | talk to her.  If she has a problem, have her call |
| 3 | | me.  But I'd like my independent contractor; it's |
| 4 | | been long enough, waiting, and asking for it. |
| 5 | | And I said, Please work on that.  And I went on |
| 6 | | to something else. |
| 7 | Q | So you didn't tell her to not issue the checks? |
| 8 | | Because you just testified she had already |
| 9 | | written them out. |
| 10 | A | She had a stack of checks.  I didn't even |
| 11 | | know -- there's stuff in there like -- a stack |
| 12 | | like that (indicating).  When checks are signed |
| 13 | | or -- signed and -- |
| 14 | Q | Do you sign the checks or does she? |
| 15 | A | I sign the checks. |
| 16 | Q | So she prepares a stack of checks, you look them |
| 17 | | over and sign them and then I assume she sends |
| 18 | | them out, correct? |
| 19 | A | That is correct. |
| 20 | Q | Did you tell her not to give Starcha her checks |
| 21 | | until Starcha returned the independent contractor |
| 22 | | agreement? |
| 23 | A | I don't believe I necessarily put it that way. |
| 24 | | I -- I don't recall.  I said, What's the problem? |
| 25 | | How come?  Wait for Starcha again?  What's the |

Page 53

| | | |
|---|---|---|
| 1 | | problem?  Have her call me if there's a problem. |
| 2 | Q | So you're not sure exactly what you said, but is |
| 3 | | it true that she didn't get her checks until she |
| 4 | | signed the agreement? |
| 5 | A | No.  No.  She would have got her check, I think, |
| 6 | | irrespective of that.  I just wanted to have the |
| 7 | | contractor agreement back or have Starcha call |
| 8 | | me to see what the problem is, which she never |
| 9 | | did. |
| 10 | Q | So -- |
| 11 | A | And I was unaware of anything. |
| 12 | Q | At this point you're -- Starcha had been there |
| 13 | | for a year, and maybe you could help me |
| 14 | | understand why it was so urgent to have a signed |
| 15 | | independent contractor agreement at that very |
| 16 | | moment when she had been there for a full year. |
| 17 | A | Just office policy.  Everybody get them back. |
| 18 | | What's the problem?  Everybody -- |
| 19 | Q | Did you issue new ones to everybody? |
| 20 | A | Yes. |
| 21 | Q | Okay.  All your agents received new independent |
| 22 | | contractor agreements.  Was that in the fall of |
| 23 | | '19? |
| 24 | A | I believe so. |
| 25 | Q | Okay.  Why did you send everybody new agreements? |

Page 66

1 Q It's not there anymore.
2 A Oh. I -- I don't remember. I don't remember.
3     MR. JOHNSON: Let's take a --
4 actually, one more question, then we'll take a
5 break.
6     (Exhibit 12 marked for identification.)
7 Q Number 12, have you ever seen either side of
8 this document?
9 A No.
10 Q Is this handwriting similar to your handwriting?
11 A Not at all.
12 Q Other than in this lawsuit, it's your testimony
13 you've never seen or witnessed this letter?
14 A Nothing to do with this. Absolutely nothing to
15 do with this.
16     MR. JOHNSON: Okay. All right.
17 We'll take a -- why don't we take a ten-minute
18 break.
19     THE WITNESS: Okay.
20     MR. JOHNSON: We can go off the
21 record. Thank you.
22     (Recess held.)
23     MR. JOHNSON: All right. We can go
24 back on the record.
25 Q We were discussing loans that you had given to

Page 67

1 independent contractors that work for you. Were
2 there agreed payment terms for each of these
3 loans?
4 A Yes, we agreed.
5 Q And were those verbal or written agreements,
6 typically?
7 A I'm not sure. Both.
8 Q Both? Sometimes written, sometimes verbal? Is
9 that accurate?
10 A I believe so. I -- I don't recall. 100 percent.
11 Q Do you know which one was more common?
12 A I -- horse apiece.
13 Q Would it depend on the size of the loan? For
14 instance, a $5,000 loan versus a $60,000 loan,
15 would you be more likely to get written terms on
16 the larger loan?
17 A Not necessarily.
18 Q Would it depend on the person that you're lending
19 it to?
20 A Just given the situation.
21 Q So you would just take it case by case and shoot
22 from the hip? Is that kind of what I'm hearing?
23 A Not shoot from the hip. Just have a good
24 understanding.
25 Q Okay. Was there any specific circumstance which

Page 68

1 would have normally made you want to get it in
2 writing?
3 A I'm trying to think of the ones that I did. Just
4 depends on the circumstance, what --
5 Q Would you charge -- I'm sorry. Were you saying
6 something?
7 A (Shakes head from side to side.)
8 Q Would you charge the same interest rate on all
9 the loans or did that change?
10 A No. Varied. Sometimes nothing.
11 Q So sometimes you wouldn't charge interest?
12 A Correct.
13 Q What would make one loan have interest and one
14 loan not? What were the factors you would
15 consider?
16 A Just given the situation.
17 Q Do you remember, did you charge Starcha interest?
18 A I don't specifically recall. Nominal at best,
19 not --
20 Q When you say nominal, are you referring to like
21 the minimum imputed interest rate or something
22 like that?
23 A This was similar to loaning a family member
24 money.
25 Q Would you talk about the repayment terms? So

Page 69

1 were there expectations on when it would be
2 repaid and how?
3 A Everything's clearly understood from a repayment
4 perspective, yes, before it's consummated, yes.
5 Q And with Starcha's loans, was the agreement that
6 you would take a certain sum out of her
7 commission checks as she earned them?
8 A Well, she had made a commitment as to how it was
9 going to be repaid.
10 Q And what were those -- what was that commitment?
11 For the cash advances, not the lease and option.
12 A Her cash advances were generally you can take --
13 just take it out of my commission checks as they
14 come forward.
15 Q Would there be a fixed amount, like take a
16 thousand dollars per check?
17 A Whatever was agreed upon. I -- I don't recall
18 the specifics.
19 Q Did you ever take a larger amount of a commission
20 check than you originally agreed on?
21 A I don't believe so.
22 Q And you don't recall what the specific amounts
23 that you agreed to take were?
24 A I don't recall.
25 Q Do you keep a record of these things?

Page 70

1  A  Yes.
2  Q  Are you willing to provide that to me?
3        MR. HERMON:  Objection.  If you want
4  documents -- by request for production we'll
5  produce them in due course under the rules.
6        MR. JOHNSON:  I'm asking if he's
7  willing to.
8        MR. HERMON:  I'm instructing him that
9  he's not going to.  He's going to do it by the
10 rules.
11       MR. JOHNSON:  I think it's his
12 decision.
13 A  At the advice of my counsel I will take my
14 counsel's advice.
15 Q  So you're refusing to provide them?
16       MR. HERMON:  Unless you provide --
17 Q  You have the -- just to be clear, you have the
18 right to refuse.  I'm just clarifying that you're
19 refusing to provide them.
20       MR. HERMON:  I'm -- we're not --
21 we're not refusing or -- or agreeing to provide
22 anything.  We're saying there are rules in the
23 Federal Rules of Civil Procedure you have to
24 follow.  If you want to file a request for
25 documents, follow those rules and we'll deal

Page 71

1  with it in due course.
2        MR. JOHNSON:  There's no rule that
3  says you cannot provide them.
4        MR. HERMON:  Sure, there is.  You
5  have to file a request.
6        MR. JOHNSON:  No, there's no rule that
7  says that you cannot do informal discovery.
8        MR. HERMON:  Oh, sure.  We can provide
9  you whatever we wanted to.  We're saying we're not
10 going to --
11       MR. JOHNSON:  My point.  So you're
12 just saying that you refuse to do that?
13       MR. HERMON:  Right.  We're not going
14 to engage in formal discovery.
15 Q  So you're refusing on advice of counsel to engage
16 in informal discovery and provide any further
17 documents; is that correct?
18 A  Upon the advice of my counsel, yes.
19       MR. JOHNSON:  All right.  Thank you.
20 I am done with my questions.  Do you have any?
21       MR. HERMON:  I don't have anything.
22 We'll reserve our right to read and sign.  Thank
23 you.
24       (Proceedings concluded at 1:59.)
25

Page 72

1  STATE OF WISCONSIN    )
2  COUNTY OF BROWN       )
3
4
5        I, CARRIE S. BOHRER, a Notary Public,
6  Registered Professional Reporter, Registered Merit
7  Reporter, and Certified Realtime Reporter, in and
8  for the State of Wisconsin, do hereby certify that
9  the foregoing proceedings were taken at said time
10 and place and is a true and accurate transcript of
11 my original machine shorthand notes.
12       That the appearances were as noted
13 initially.
14       That said witness was first duly
15 sworn/affirmed to testify the truth, the whole truth
16 and nothing but the truth relative to said cause.
17
18 Dated at Green Bay, Wisconsin
   This 18th day of July, 2023.
19
20
21
       CARRIE S. BOHRER, RPR, RMR, CRR
22     Notary Public, State of Wisconsin
       My commission expires 10/30/24
23
24
25

Page 73

1  STATE OF _____ )
                         )
2  COUNTY OF _____ )
3
4        I, JOSEPH S. DULAK, do hereby certify
5  that the foregoing transcript was taken of me on
6  July 11, 2023; that I have read the foregoing
7  transcript; that corrections, if any, are itemized
8  on a separate page attached hereto; that said
9  transcript is now a true and correct transcript of
10 my testimony.
11
12 _____
13 Date
14              _____
15                    JOSEPH S. DULAK
16 State of _____
17 County of _____
18
19 This document was signed before me on
20 _____ by _____.
           (Date)           (Deponent)
21
22
   _____        Seal:
23   (Notary's signature)
24
   _____
25   (Expiration date)