# EXHIBIT C

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WISCONSIN
 2                       GREEN BAY DIVISION
     ----------------------------------------------------------
 3
     STARCHA SPORRER,
 4
             Plaintiff,
 5
        -vs-                         Case No.:  1:22-cv-01110-WCG
 6
     JOSEPH DULAK and KEEKO, LLC,
 7
             Defendants.
 8
     ----------------------------------------------------------
 9

10

11       DEPOSITION OF:    ANITA M. ANDERSON

12
         DATE:             July 11, 2023
13

14       TIME:             9:01 a.m. - 10:44 a.m.

15
         LOCATION:         JOHNSON & WILSON LAW S.C.
16                         1745 Stephenson Street
                           Marinette, Wisconsin
17

18

19
     REPORTED BY:
20   CARRIE S. BOHRER, RPR, RMR, CRR
     CARRIE BOHRER REPORTING, LLC
21   www.cbreportingllc.com
     920-606-3046
22

23

24

25
```



Page 2

```
 1         A P P E A R A N C E S
 2
     JOHNSON & WILSON LAW S.C., by
 3   NATHANIEL A. JOHNSON, Attorney at Law
     1745 Stephenson Street
 4   Marinette, Wisconsin  54143
     715-735-6671
 5   nathaniel@johnsonwilsonlaw.com
          appeared on behalf of the Plaintiff
 6
     DYKEMA GOSSETT PLLC, by
 7   JAMES F. HERMON, Attorney at Law
     400 Renaissance Center
 8   Detroit, Michigan  48243
     313-568-6540
 9   jhermon@dykema.com
10        appeared on behalf of the Defendants
11
     Also Present:
12
     Starcha Sporrer, Plaintiff
13
     Joseph S. Dulak, Defendant
14
15              * * * * *
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        TRANSCRIPT OF PROCEEDINGS
 2            (Exhibits 1 through 7 marked for
 3   identification.)
 4            ANITA M. ANDERSON, called as a witness
 5   herein, having been first duly sworn/affirmed,
 6   was examined and testified as follows:
 7            MR. HERMON:  Before we start taking
 8   testimony in Ms. Anderson's deposition, I did
 9   want to get an agreement that we made before we
10   went on the record on the record.  This
11   deposition was noticed only stenographically,
12   not for video deposition.  A video camera is
13   being used to record Ms. Anderson's testimony.
14   It was represented by counsel that it would not
15   be introduced for any purpose in any court
16   proceeding and that I would be provided a copy
17   of the video record upon completion of the
18   deposition, and on that basis I'm allowing the
19   deposition to go forward with video recording.
20   I just wanted to get that agreement on the
21   record.
22            MR. JOHNSON:  That is agreed.
23            MR. HERMON:  Great.  Thank you.
24            MR. JOHNSON:  It may be moot because
25   the recorder is not opening.
```

Page 3

```
 1              I N D E X
 2   EXAMINATION BY:                          PAGE
 3   Mr. Johnson ................................  5
 4
     EXHIBITS MARKED:                     PAGE ID'D
 5
     Exhibit 1  Notice of Subpoena ...............  7
 6
     Exhibit 2  Lease and Option to Purchase
 7              Agreement ........................ 18
 8   Exhibit 3  Starcha Sporrer rental payment
                log .............................. 30
 9
     Exhibit 4  Email correspondence between
10              Ms. Sporrer and Ms. Anderson ...... 48
11   Exhibit 5  Text messages ..................... 38
12   Exhibit 6  Wisconsin Realtors Association
                Real Estate Independent Contractor
13              Agreement ........................ 46
14   Exhibit 7  Michigan Independent Contractor
                Agreement ........................ 46
15
     (Exhibit 8 marked in Joseph Dulak's deposition)
16
     Exhibit 9  Notary bond and notary commission
17              card ............................. 15
18       (Original exhibits were attached to original
                transcript; copies to counsel.)
19
20   REQUESTED INFORMATION:                    PAGE
21   NONE
22
23
24      (Original transcript filed with Attorney Johnson.)
25
```

Page 5

```
 1        Okay.  This is a deposition of Anita Anderson
 2        in a lawsuit by Starcha Sporrer against Keeko,
 3        LLC and Joseph Dulak pending in the U.S. District
 4        Court for the Eastern District of Wisconsin,
 5        Green Bay Division.  It's being conducted at the
 6        law office of Johnson & Wilson in Marinette,
 7        Wisconsin.
 8            Everyone present in the room is Anita
 9        Anderson, the deponent; along with her attorney;
10        Mr. Joe Dulak; and Ms. Starcha Sporrer; along
11        with her attorney, myself.  Today's date is
12        July 11th, 2023.
13                    EXAMINATION
14   BY MR. JOHNSON:
15   Q   Good morning, Ms. Anderson.  How are you today?
16   A   Good.
17   Q   Good.  My name is Attorney Nathaniel Johnson.  I
18       know we've met before.  And I represent Starcha
19       in this case in the lawsuit against Keeko, LLC
20       and Joseph Dulak.  Every word that is said today
21       is going to be taken down by the court reporter,
22       so it's really important that we speak clearly,
23       that we speak in audible terms, not using
24       gestures or nonaudible terms so that she can take
25       it down.  It's also important that we don't talk
```



Page 6

```
 1   over each other, so I would ask that you allow
 2   me to finish my question before you provide an
 3   answer.  If at any point you're unsure of the
 4   question or it doesn't make sense or if you
 5   don't understand it, please let me know and I
 6   will do my best to rephrase the question to
 7   ensure that you understand the question.  If you
 8   answer the question I'll assume that you
 9   understand it.  Is that fair?
10 A Yes.
11 Q Excellent.  Do you understand that your testimony
12   today is being given just as if you were in
13   court?
14 A Yes, I understand that.
15 Q Okay.  And that this is a matter pending in the
16   U.S. District Court in Green Bay?
17 A Yes.
18 Q Okay.  If at any time you need a break or if you
19   need to speak with your attorney, please let me
20   know.  I would also -- just for everyone's
21   purposes, we have a bathroom through this door
22   if you need it.
23       Okay.  Do you have any questions before we
24   begin?
25 A I do not.
```

Page 7

```
 1 Q Excellent.  Can you state your full name for the
 2   record.
 3 A Anita Mae Anderson.
 4 Q And did you receive a notice to appear today?
 5   I'll hand you what's been marked Exhibit 1.
 6   Have you seen that document?
 7 A Yes, I did receive this.
 8 Q Okay.  Have you ever been deposed before?
 9 A I have not.
10 Q Okay.  And I assume, because I received your
11   objection, that you are represented by counsel.
12   Is that accurate?
13 A Yes.
14 Q And who is your attorney?
15 A James Hermon.
16 Q Have you ever been convicted of a felony?
17 A No, I have not.
18 Q Have you ever been involved in a lawsuit as a
19   party?
20 A I'm sorry, what was that?
21 Q Have you ever been involved in a lawsuit as a
22   party?  In other words, have you sued someone or
23   been sued by someone?
24 A Yes, I have.
25 Q And when was that?
```

Page 8

```
 1 A Probably -- oh.  Over fifteen years ago.
 2 Q Do you remember what that was about?
 3 A I got divorced.
 4 Q So was it a divorce action?
 5 A I don't know what the --
 6 Q Sure.
 7 A -- term is for that, but --
 8 Q Is that the only lawsuit that you can remember?
 9 A No.  There was another lawsuit.  I was the
10   plaintiff and it was against a former employer.
11 Q And who was the employer?
12 A It was a credit union that I worked at.
13 Q Do you remember the name of it?
14 A I -- not right now I don't.
15 Q Are they local?
16 A Yes.
17 Q And when did this lawsuit occur?
18 A 24 years ago.
19 Q And what did you sue them for?
20 A I don't know like what the official thing was.
21 Q You can tell me in your words.
22 A Okay.  I -- my hours were reduced because I was
23   pregnant.
24 Q Okay.  So does the word discrimination sound
25   familiar?
```

Page 9

```
 1 A Yes.
 2 Q Okay.  Do you think it was a discrimination
 3   lawsuit because you were treated unfairly?
 4 A Correct.
 5 Q What was the outcome of that lawsuit?
 6 A We settled out of court.
 7 Q Do you remember what you settled for?
 8 A I do not remember the exact amount.  It was --
 9   the amount was the difference that I had to pay
10   for medical, for like OB-GYN, delivery, whatever,
11   because becoming part time I lost my insurance
12   there, so my husband had insurance, so it was
13   the residual.  I just settled for what I would
14   have to pay.
15 Q Okay.  Thank you.  Any other lawsuits that you
16   can recall?
17 A No.
18 Q Do you know Joseph Dulak?
19 A Yes, I do.
20 Q And how do you know him?
21 A I work with him.  For him.
22 Q Do you work for him?  Is he your boss?
23 A Yes.
24 Q There was quite a hesitation there.  Is there
25   something unique about the relationship with
```



Page 10

1     Mr. Dulak that's different than a normal
2     employer-employee relationship?
3  A  Yes.
4  Q  Can you tell me about that?
5  A  I'm not an employee.
6  Q  Okay. And are you an independent contractor?
7  A  Yes.
8  Q  So do you receive a 1099 at the end of the year?
9  A  Yes.
10 Q  And do you receive a W-2 of any sort?
11 A  No.
12 Q  And the 1099, what company does that come from?
13 A  State Wide Real Estate.
14 Q  Do you provide services to any other companies
15    besides State Wide Real Estate as an independent
16    contractor?
17 A  I do not.
18 Q  Are you an employee at any other company?
19 A  I am not.
20 Q  Have you been either of those things for -- in
21    the last five years, in other words an employee
22    for someone else or an independent contractor
23    for another company, besides State Wide for the
24    last five years?
25 A  No.

Page 11

1  Q  How long have you worked with State Wide Real
2    Estate?
3  A  Since 2012.
4  Q  What did you do before 2012 as work?
5  A  Oh, there are several. Right before I started
6    at State Wide I worked at NU-VU.
7  Q  What's NU-VU?
8  A  It was factory work. They make ovens for Subway.
9  Q  Are they in Menominee?
10 A  Yes, they are.
11 Q  How long had you worked there?
12 A  I don't recall. It was a short period of time.
13    Less than a year.
14 Q  So let's fast-forward back to your time working
15    with State Wide Real Estate. Can you tell me
16    about what duties you have at State Wide?
17 A  There's a lot. It's different day-to-day. I --
18    I enter things into the MLS, I advertise listings
19    on social media, I prepare documents.
20 Q  What type of documents?
21 A  Anything to do with listing or selling a home.
22 Q  That's a pretty broad category. Can you give me
23    some examples?
24 A  An offer to purchase, an agency disclosure, a
25    lead-based paint disclosure, a listing agreement.

Page 12

1  Q  Are these agreements that you prepare, are they
2    form documents, or is this something that you
3    produce yourself?
4  A  It is fill in the blank.
5  Q  And where do you obtain these fill-in-the-blank
6    forms from?
7  A  I believe it's the Wisconsin Realtor Association.
8    And then there's one in Michigan too.
9  Q  Do you keep these forms on the computer
10    somewhere? You can access them?
11 A  I do.
12 Q  And where is that computer kept?
13 A  I -- there's one at my home, there's one in the
14    Menominee office, and there's one in the
15    Marinette office.
16 Q  And do you work out of both the Marinette and
17    the Menominee office?
18 A  I do.
19 Q  Do you ever draft leases as part of your job
20    duty?
21 A  Yes, I do.
22 Q  And are those on a preprinted form?
23 A  Yes, they are.
24 Q  And where does that lease preprinted form come
25    from?

Page 13

1  A  I believe the Wisconsin -- like zipForms.
2  Q  zipForms?
3  A  Correct.
4  Q  Is that a company?
5  A  I don't know.
6  Q  But it's safe to say that it did not come from a
7    law office?
8  A  That's correct.
9  Q  Do you draft options to purchase?
10 A  I do.
11 Q  Do you do that both in Wisconsin and Michigan?
12 A  Yes.
13 Q  And do you draft leases for both -- clients in
14    both states? To be --
15 A  Yeah.
16 Q  -- specific, Wisconsin and Michigan.
17       MR. HERMON: I'm going to object. I
18    don't think she testified she did it for clients.
19    But go ahead.
20 A  Could you repeat that?
21 Q  Sure. Do you prepare leases for State Wide in
22    both Wisconsin and Michigan?
23 A  Yes.
24 Q  When you prepare the leases, do you meet with
25    the customer or client that has hired State Wide



Page 34

1 Q I'll be specific. So do you issue the commission
2   checks for State Wide?
3 A I write them.
4 Q Did you write -- let's look at the same one from
5   March 12th, '21, Check Number 9457. Did you
6   issue that check?
7 A I don't recall that date issuing that check.
8   But most of the checks I did issue.
9 Q Who else issues State Wide checks?
10 A Joe would if I was out of the office for some
11   reason.
12 Q Anyone else?
13 A No.
14 Q So it's safe to say that it was either Joe or
15   you who issued the State Wide Check 9457?
16 A That would be a correct statement, yes.
17 Q Okay. And whoever issued that check, did they
18   withhold $2,000 out of the full amount and apply
19   it on this spreadsheet?
20 A Yes.
21 Q And are you aware if Starcha requested that to
22   occur?
23 A On this date, on this check, I don't recall.
24 Q Are you aware if she requested that these amounts
25   be taken out of the State Wide checks at all?

Page 35

1 A Her and I did have a conversation about it.
2 Q Tell me about that conversation.
3 A She was getting -- receiving a commission check,
4   or there was set to be a closing, and she --
5   maybe I reached out to her. I don't remember
6   who reached out to who, but the gist of the
7   conversation was, Can you not take it out of
8   this check and take it out of the next one?
9 Q And was that related to this specific transaction
10   on line -- March 12th, or is that -- or do you
11   recall?
12 A I don't recall which date it would have been on.
13 Q Do you know whose idea it was to take lease
14   payments out of commission checks?
15 A I do not.
16 Q Do you work or provide other payroll services to
17   State Wide?
18 A What is the question?
19 Q Do you provide any payroll services for State
20   Wide?
21 A Can you give me an example of a payroll service?
22 Q Well, you stated that you do these commission
23   checks or you produce these commission checks;
24   is that correct?
25 A That is correct.

Page 36

1 Q Do you do any other type of checks that are
2   issued to either employees or independent
3   contractors of State Wide?
4 A Other agents' commission checks I would be
5   writing. When we did have an employee, like I
6   would make the check and deposit it, but we had
7   an accountant or service that did payroll.
8 Q Do you have -- are you aware if State Wide has
9   any employees now?
10 A There are not.
11 Q Okay. Are you the primary person responsible for
12   issuing commission checks to their salespeople?
13 A Yes, I am.
14 Q Is there a standard procedure for doing that?
15 A For writing a check?
16 Q For issuing commission checks, yes. Does someone
17   bring you a form saying, I get this check, I've
18   earned this commission? What's the process?
19   What happens?
20 A When an agent knows or has a scheduled closing,
21   they will send me over a copy of their closing
22   statements, and I use that to figure out what
23   their commission check will be and write it.
24 Q And does Mr. Dulak review those before you send
25   them out?

Page 37

1 A Review --
2 Q The commission checks.
3 A Yes.
4 Q Do you commonly withhold amounts out of those
5   commission checks for any of the agents?
6 A Commonly? It's not -- can you ask that question
7   a different way?
8 Q Yes. Do you withhold amounts out of any of the
9   commission checks to other agents besides
10   Starcha?
11 A Yes.
12 Q And what amounts do you withhold? What are they
13   for?
14 A Normally it would be office or MLS charges.
15 Q Any other expenses that you're aware of?
16 A There were other agents that would have a loan
17   that had borrowed money from Joe that would pay
18   it back like that also.
19 Q Did you withhold a percentage from anyone's
20   commission check that would be paid back at the
21   end of the year?
22 A No.
23 Q Did you do that with Starcha's commission checks?
24 A Withhold an amount that -- to pay her back?
25 Q At the end of the year.



Page 38

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | I'm going to hand you what's been marked |
| 3 | | Exhibit 5. It's some text messages. And I'll |
| 4 | | direct you to the top of that. Do you recognize |
| 5 | | this -- this text exchange? And I'll represent |
| 6 | | to you that this is a text message exchange off |
| 7 | | a cell phone. |
| 8 | A | Okay. |
| 9 | Q | And at the top of it it has your name, Anita. |
| 10 | | Have you seen this conversation? |
| 11 | | MR. HERMON: This is Exhibit 5? |
| 12 | | MR. JOHNSON: Correct. |
| 13 | | MR. HERMON: Thank you. First page |
| 14 | | is "And do you know"? |
| 15 | | MR. JOHNSON: Correct. |
| 16 | | MR. HERMON: Okay. Thank you. |
| 17 | A | (Reviewing document.) Oh, is this two different |
| 18 | | time frames? |
| 19 | Q | Yes. The dates are on there. The first page |
| 20 | | was February 7th of 2020, the second page at the |
| 21 | | top you'll see the date February 13th of 2020. |
| 22 | A | Okay. |
| 23 | Q | So that was a few days later. |
| 24 | | MR. HERMON: Did you want her to read |
| 25 | | the second page now? |

Page 39

| | | |
|---|---|---|
| 1 | | MR. JOHNSON: She can if she wants |
| 2 | | for context. |
| 3 | | MR. HERMON: Okay. |
| 4 | Q | Are these messages between you and Starcha? |
| 5 | A | It appears to be, yes. |
| 6 | Q | And I see on the top page it appears that |
| 7 | | Starcha's asking you "when Joe usually pays us |
| 8 | | for the money he withholds from last year." |
| 9 | | Did you withhold amounts out of Starcha's |
| 10 | | checks that would be paid the following year? |
| 11 | A | No. |
| 12 | Q | Okay. So it appears, the second box in your |
| 13 | | response, you say that "You are the only one. I |
| 14 | | have total here and he wanted to double check |
| 15 | | it." |
| 16 | | What do you mean, she was the only one? |
| 17 | A | From her text I assumed she was talking about a |
| 18 | | bonus check. |
| 19 | Q | About what check? |
| 20 | A | A bonus check. |
| 21 | Q | Um-hmm. |
| 22 | A | Which would be paid in February. |
| 23 | Q | So I'm going read you that first message that |
| 24 | | she sent you. "And do you know when Joe usually |
| 25 | | pays us the money he holds from last year? Or |

Page 40

| | | |
|---|---|---|
| 1 | | not sure if he holds money for everyone or how |
| 2 | | that works but I'm just wondering when that gets |
| 3 | | paid out. I know when I worked for Veriah's |
| 4 | | they always gave it to us on our W-2." |
| 5 | | You responded, "You are the only one. I |
| 6 | | have total here he wanted to double check it." |
| 7 | | So let me ask the question again. Did you |
| 8 | | withhold amounts from Starcha's commission checks |
| 9 | | that would be paid to her in the following year |
| 10 | | after they were withheld? |
| 11 | | MR. HERMON: Object. It's asked and |
| 12 | | answered. You can answer it again. |
| 13 | A | No. |
| 14 | Q | What are you referring to in this text message, |
| 15 | | "you are the only one"? |
| 16 | A | A bonus check that she received. |
| 17 | Q | How did you calculate that bonus? |
| 18 | A | It was a percent of the total of the checks we |
| 19 | | issued her. |
| 20 | Q | And that percentage of the checks that were |
| 21 | | issued to her, were those amounts withheld out |
| 22 | | of the checks? |
| 23 | A | Can you say that again? |
| 24 | Q | The total percentage that you've just testified |
| 25 | | was what you categorized as a bonus payment, were |

Page 41

| | | |
|---|---|---|
| 1 | | those amounts withheld out of commission checks? |
| 2 | A | No. |
| 3 | Q | Where did that bonus amount come from? |
| 4 | A | Totaled all of her checks what State Wide had |
| 5 | | paid out to her for the year, and then it was a |
| 6 | | percent of -- of that total. |
| 7 | Q | Who instructed you to do that? |
| 8 | A | Joe. |
| 9 | Q | And did he tell you what percentage to issue in |
| 10 | | that bonus check? |
| 11 | A | Yes, he did. |
| 12 | Q | And did you only do this for Starcha? |
| 13 | A | No. There were other agents. |
| 14 | Q | So that takes me back to my prior question that |
| 15 | | I'm not sure I got an answer for yet. What do |
| 16 | | you mean, you are the only one? |
| 17 | A | In 2020 she would have been the only one. |
| 18 | Q | That received a bonus check? |
| 19 | A | She would have been the only agent in 2020 that |
| 20 | | received a bonus check. |
| 21 | Q | Okay. If the money was not money that was |
| 22 | | withheld out of the commission checks as you |
| 23 | | testified, when Starcha said in that message |
| 24 | | that Joe usually paid -- "when Joe usually pays |
| 25 | | us for the money he holds from last year," why |

